RECORD NO. 15-4029

In The

# United States Court of Appeals

## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## MARIO MARQUISE TAYLOR,

*Defendant – Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE

_____

## BRIEF OF APPELLANT

_____

**Ross Hall Richardson, Executive Director**
**FEDERAL DEFENDERS OF**
  **WESTERN NORTH CAROLINA, INC.**

**Ann L. Hester**
**FEDERAL DEFENDERS OF**
  **WESTERN NORTH CAROLINA, INC.**
**129 West Trade Street, Suite 300**
**Charlotte, North Carolina  28202**
**(704) 374-0720**

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

INTRODUCTION.......................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 3

STATEMENT OF THE ISSUES ......................................................... 3

STATEMENT OF THE CASE ........................................................... 4

    I.    The Federal Charge ............................................................. 4

    II.   The Suppression Hearing .................................................... 4

    III.  Jury selection .................................................................. 9

    IV.  Trial .............................................................................. 11

        A.    The trial evidence.................................................... 11

        B.    The constructive possession instruction ...................... 18

        C.    The jury's verdict.................................................... 18

    V.   Sentencing ..................................................................... 18

SUMMARY OF ARGUMENT .......................................................... 19

ARGUMENT ............................................................................... 20

    I.    Law enforcement officers violated Taylor's Fourth Amendment rights when they seized him without reasonable suspicion...................... 20

        A.    Standard of Review.................................................. 20

        B.    Police officers seized Taylor when they approached the car in which Taylor was seated as a passenger...................... 20

i

C.   The officers had no reasonable suspicion when they stopped Taylor................................................................... 25

II.   The district court clearly erred when it denied Taylor's *Batson* objection to the prosecution's strike of Juror Robinson.......................... 30

A.   Standard of Review........................................................... 30

B.   The Equal Protection Clause prohibits striking jurors based on race................................................................................ 30

C.   The district court clearly erred when it failed to engage in necessary comparative juror analysis and when it concluded that the government's proffered reasons were not pretextual........................................................................... 34

III.  The district court committed reversible error when it instructed the jury on the theory of constructive possession when no evidence supported that theory .................................................. 38

A.   Standard of Review........................................................... 38

B.   The district court should not have instructed the jury on constructive possession, because no evidence supported a theory that Taylor constructively possessed the firearm............... 39

C.   The court's error in giving a constructive possession instruction prejudiced Taylor ........................................... 41

CONCLUSION ............................................................................................ 42

REQUEST FOR ORAL ARGUMENT.......................................................... 42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Avery v. Georgia,*
 345 U.S. 559 (1953) .......................................................................... 31

*Batson v. Kentucky,*
 476 U.S. 79 (1986) ...................................................................*passim*

*Brendlin v. California,*
 551 U.S. 249 (2007) .......................................................................... 21

*California v. Hodari D.,*
 499 U.S. 621 (1991) .......................................................................... 21

*Florida v. Bostick,*
 501 U.S. 429 (1991) .......................................................................... 21

*Florida v. J.L.,*
 529 U.S. 266 (2000) .....................................................................26, 27

*Jones v. Plaster,*
 57 F.3d 417 (4th Cir. 1995) ............................................................. 30

*Miller-El v. Dretke,*
 545 U.S. 231 (2005) ..................................................................32, 33, 37

*Miranda v. Arizona,*
 384 U.S. 436 (1966) ....................................................................... 4, 5

*Powers v. Ohio,*
 499 U.S. 400 (1991) .......................................................................... 31

*Reid v. Georgia,*
 448 U.S. 438 (1980) .......................................................................... 25

*Snyder v. Louisiana,*
 552 U.S. 472 (2008) ............................................................ 30, 31, 33, 34

*Terry v. Ohio,*
    392 U.S. 1 (1967) ................................................................20, 21, 25

*United States v. Barnette,*
    644 F.3d 192 (4th Cir. 2011) ....................................... 30, 32, 37, 38

*United States v. Basham,*
    561 F.3d 302 (4th Cir. 2009) ................................................... 38

*United States v. Black,*
    707 F.3d 531 (4th Cir. 2013) ............................................*passim*

*United States v. Blue,*
    957 F.2d 106 (4th Cir. 1992) .............................................. 40, 41

*United States v. Dinkins,*
    691 F.3d 358 (4th Cir. 2012) ................................................... 32

*United States v. Farrior,*
    535 F.3d 210 (4th Cir. 2008) ................................................... 31

*United States v. Ferg,*
    504 F.2d 914 (5th Cir. 1974) ................................................... 40

*United States v. Forbes,*
    816 F.2d 1006 (4th Cir. 1987) ............................................ 32, 34

*United States v. Foreman,*
    369 F.3d 776 (4th Cir. 2004) ................................................... 27

*United States v. Foster,*
    634 F.3d 243 (4th Cir. 2011) .......................................... 1, 26, 28

*United States v. Gallimore,*
    247 F.3d 134 (4th Cir. 2001) ................................................... 40

*United States v. Garrison,*
    849 F.2d 103 (4th Cir. 1988) ................................................... 36

*United States v. Gray,*
    883 F.2d 320 (4th Cir. 1989 ............................................... 21, 22

*United States v. Higgs*,
    353 F.3d 281 (4th Cir. 2003)................................................................. 38

*United States v. Jackson*,
    124 F.3d 607 (4th Cir. 1997)................................................................. 40

*United States v. Jeffers*,
    570 F.3d 557 (4th Cir. 2009)................................................................. 38

*United States v. Jones*,
    678 F.3d 293 (4th Cir. 2012)..........................................................*passim*

*United States v. Kerr*,
    817 F.2d 1384 (9th Cir. 1987)............................................................... 24

*United States v. Kitchens*,
    114 F.3d 29 (4th Cir. 1997)................................................................... 20

*United States v. Lane*,
    866 F.2d 103 (4th Cir. 1989)................................................................. 30

*United States v. Martinez-Salazar*,
    528 U.S. 304 (2000).............................................................................. 30

*United States v. Massenburg*,
    654 F.3d 480 (4th Cir. 2011)................................................................. 27

*United States v. McCoy*,
    513 F.3d 405 (4th Cir. 2008)................................................................. 20

*United States v. McMillon*,
    14 F.3d 948 (4th Cir. 1994)................................................................... 32

*United States v. Mendenhall*,
    446 U.S. 544, 554 (1980) ...................................................................... 21

*United States v. Moye*,
    454 F.3d 390 (4th Cir. 2006)................................................................. 38

*United States v. Richardson*,
    385 F.3d 625 (6th Cir. 2004)................................................................. 25

*United States v. Schnabel,*
    939 F.2d 197 (4th Cir. 1991) ............................................................ 39

*United States v. Shorter,*
    328 F.3d 167 (4th Cir. 2003) ............................................................ 40

*United States v. Sprinkle,*
    106 F.3d 613 (4th Cir. 1997) ............................................................ 28

*United States v. Whittington,*
    26 F.3d 456 (4th Cir. 1994) ............................................................ 39

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. IV ............................................................ 3, 4, 20, 21

U.S. CONST. amend. V ............................................................ 4

## STATUTES

18 U.S.C. § 922(g)(1) ............................................................ 3, 4

18 U.S.C. § 3231 ............................................................ 3

18 U.S.C. § 3742 ............................................................ 3

28 U.S.C. § 1291 ............................................................ 3

## INTRODUCTION

This case provides yet another example of "the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). Here, Mario Taylor was traveling as a passenger in a car with two companions when they encountered two police officers on motorcycles at an intersection. The officers followed the car and, after the driver pulled into a driveway close to the road, watched the car from a position across the street for two minutes while the driver knocked on the door of a duplex, got no answer, and returned to the car. The officers then parked their motorcycles next to the car and approached the car, with one officer asking questions and the other positioned diagonally from him several feet behind the back of the car, moving back and forth as the questioning officer shifted from one side of the vehicle to the other. The questioning officer, rather than asking the men if they would answer some questions, immediately launched into questioning them and asking for their identification. The district court found the officers seized Taylor when they approached, and this was correct: *United States v. Jones*, 678 F.3d 293, 300 (4th Cir. 2012), establishes that the officers seized Taylor.

The district court, though, denied Taylor's motion to suppress based on its erroneous conclusion that the officers had reasonable suspicion justifying the seizure. The district court failed to identify any offense the officers could have suspected Taylor of committing, although it found that the officers were in the neighborhood in

response to a call concerning a burglary. But the officers provided no information about that call—it was not attributed to an identified caller, and the officers offered no description of the suspect they were looking for. Without any information connecting that call to the men in the vehicle, it cannot support any reasonable suspicion. The remaining circumstances identified by the district court—that the men looked away from the officers when passing them, that they remained parked for 45 seconds after finding no one home at the duplex where they stopped, and that Taylor's window was partially rolled down—do nothing to connect the men to a burglary or to any other criminal activity. Rather than establishing reasonable suspicion, the facts identified by the district court merely assembled a set of innocent factors "which cannot rationally be relied on to establish reasonable suspicion." *United States v. Black*, 707 F.3d 531 (4th Cir. 2013). This Court should reverse the district court's ruling on Taylor's suppression motion and vacate Taylor's conviction.

Alternatively, the Court should vacate Taylor's conviction as the result of the district court's clear error in overruling Taylor's objection, under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the government's peremptory strike of the last African-American juror in the jury pool. That strike resulted in an all-white jury. The district court clearly erred both in finding that the government's stated reasons for the strike were not pretextual and in failing to conduct comparative juror analysis when Taylor compared the struck juror with other white jurors whom the government left on the panel.

The district court also committed a reversible error when it gave a constructive possession jury instruction, over Taylor's objection, when no evidence in the record could support an inference of constructive possession. In a case where evidence of actual possession was, as the district court described it, "pretty close," JA 592, instructing the jury on constructive possession was prejudicial and requires reversal of Taylor's conviction.

## JURISDICTIONAL STATEMENT

Mario Taylor appeals from a judgment entered on January 12, 2015, in the United States District Court for the Western District of North Carolina. JA 738. He timely filed a notice of appeal on January 15, 2015. JA 744. This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291. The district court had jurisdiction under 18 U.S.C. § 3231 and 18 U.S.C. § 922(g)(1).

## STATEMENT OF THE ISSUES

I.    Whether law enforcement officers seized Taylor without reasonable suspicion, in violation of the Fourth Amendment.

II.    Whether the district court clearly erred when it overruled Taylor's *Batson* objection.

III.    Whether the district court committed reversible error when it instructed the jury on the theory of constructive possession when no evidence supported that theory.

3

## STATEMENT OF THE CASE

### I.     The Federal Charge

On September 17, 2013, a federal grand jury in the Western District of North Carolina charged Mario Taylor with a single count of possessing a firearm on or about November 26, 2012, after having been convicted of a crime punishable by more than one year's imprisonment, in violation of 18 U.S.C. § 922(g)(1). JA 10. Taylor pleaded not guilty and proceeded to trial.

### II.    The Suppression Hearing

Before trial, Taylor moved to suppress evidence obtained in violation of the Fourth and Fifth Amendments. JA 12. That motion related to two separate encounters between Taylor and police. Taylor asserted that officers violated the Fourth Amendment when they stopped him on November 26, 2012, without any probable cause or reasonable, articulable suspicion. JA 23-24. As the result of that stop, officers identified Taylor and decided to submit Taylor's previously-obtained DNA sample for comparison to a DNA test run on a firearm found approximately 75 feet from the location where Taylor and two companions were stopped. *Id.* Taylor also asserted that officers violated the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966), approximately five months later, after the DNA testing had been completed and indicated a match, when they conducted a two-stage interrogation and

advised Taylor of his *Miranda* rights only after first obtaining incriminating statements from him. *Id.* at 2.[1]

On November 26, 2012, Mario Taylor was riding in the front passenger seat of a Crown Victoria with two companions, traveling on Anderson Street in Charlotte, North Carolina. JA 97. At the intersection of Anderson and Eastwood Road, Taylor and his companions passed two Charlotte-Mecklenburg Police Department (CMPD) motorcycle officers, Watson and Skipper. JA 97, 111, 120, 131. Skipper testified that the officers were in the area looking for a burglary suspect that day, although he gave no information about the source of the information about the suspect, and he provided no description of the suspect he was looking for. JA 97, 120. Watson testified that when the officers passed the Crown Victoria, the occupants "tended to either look away or look down, which gave us an indication that perhaps we should take a second look at the vehicle." JA 120. Skipper testified that he decided to run the vehicle's tag because it increased its speed. JA 97-98.

Watson and Skipper disagreed about whether the car was traveling on Anderson or was at a stop sign and turning onto Anderson from Eastwood when they saw it, but in any event, they agreed that they lost sight of it temporarily and wound up following it from a distance. JA 111-12, 120, 131. Shortly after the officers had the

---

[1] The district court granted Taylor's motion relating to the interrogation and suppressed Taylor's statements. JA 224. Consequently, this appeal does not discuss the interrogation or its results.

car in sight again, it pulled into a concrete driveway at 1414 Anderson St. JA 48,[2] 98, 101, 122, 133-34. They didn't see anything coming out of the car and didn't see anyone throwing anything. JA 134. Skipper and Watson pulled past the car, parked 60-75 feet away across the street in a field in front of a church, and "observed the vehicle and its occupants for close to a minute" from a location where "it's possible" the occupants of the car could have easily seen them. JA 99-100, 113.

As the officers watched, the driver got out of the car, went to the side of the house, and knocked on the door. JA 100. When no one answered, he returned to the car, and the three occupants continued to sit in the car for another 45 seconds. *Id.* No other cars were in the driveway at the time. *Id.* Then Skipper and Watson pulled their motorcycles into the gravel lot to the left of the car where Taylor and his companions were sitting and approached the driver's side of the car. JA 48, 101. Skipper noticed the right front passenger window was about a quarter of the way down, and Taylor had his hand outside the window. JA 102, 126. It was "very cool" that day with temperatures in the low 40s. JA 97. Without asking whether the driver would answer questions, Skipper asked the driver whether anyone was home, and the driver told him he was there to meet someone who was not home. *Id.*

Skipper then moved to the open window on the passenger side and asked if anyone had identification. JA 102-03. He didn't know any of the men. JA 117-18. The driver provided his identification, and the passengers provided their names, which

_____
[2] JA 48 is Government Exhibit 1 from the suppression hearing.

6

Skipper wrote down JA 103. Skipper testified that he recorded the information from the driver's license and returned it to the driver. *Id.* Watson did know Taylor, but he didn't recognize him until Skipper showed him the list of names. JA 127. After obtaining the men's information, Skipper asked the driver to step to the back of the car, and the driver did so. JA 103. He never told the men they were free to leave. JA 117. Skipper then asked the driver if there were any weapons in the car, and the driver said "No, you may check." JA 104. Skipper asked both passengers to get out of the car. *Id.* He was "speaking with all" of the occupants. *Id.* In fact, he frisked Taylor and the other passenger, with their consent, and found nothing. JA 105.

While Skipper was interacting with the three men, Watson was standing behind the vehicle watching and providing cover from the sidewalk, five to six feet from the car. JA 104, 115, 135. Watson changed position as Skipper changed position, moving from one side of the vehicle to the other. JA 104, 116, 124. Watson was behind the vehicle providing cover the entire time Skipper was talking to the occupants of the car. JA 124. He was watching the men the entire time to "provide safety." *Id.*

Skipper acknowledged that after frisking the passengers, he had no probable cause to arrest them and no reasonable suspicion to detain them. *Id.* at 106. Nevertheless, when he walked back to his motorcycle, he "stood by," but he never issued a citation for any traffic violation or anything else. JA 106, 110. During that time, he received a radio call that a passenger on a city bus had observed two motorcycle officers with a group of subjects on Anderson Street and had seen a

7

firearm in the grass about 70-75 feet away from them. *Id.* Skipper continued to stand by his motorcycle while crime scene technicians and backup officers were called. *Id.* at 106-07. Watson testified that the call came through while Skipper was still in contact with the three men and that he told Skipper he was "going to go over and check that out." JA 125, 127.

Shortly after Skipper finished speaking with Mario Taylor and his two companions, Officer Matthews arrived and began speaking with Taylor. JA 107. Matthews testified that he came to the scene because he heard that other officers had made contact with Taylor and a weapon was involved, and he had a "rapport" with Taylor. JA 140. When Matthews arrived, Taylor and his two companions were standing at the back of the car. JA 109, 140. Matthews asked Taylor to step away from his companions and asked him questions about the gun; Taylor said he didn't know anything about it. JA 142. Taylor refused to give a DNA sample. *Id.* at 145. Taylor then walked back to the trunk of the vehicle. JA 143.

According to Skipper, more officers arrived, and "most of them" went to 1413 Anderson, across the street, where the gun was found. JA 109. Two or three officers were on "that side of the street around the vehicle." JA 108. Skipper could not recall any time when the three men "were just hanging out on the back trunk of the vehicle but without any other officers around them." JA 109. Skipper and Watson both left the scene while officers were recovering the firearm. JA 109, 129.

After the suppression hearing, the district court denied Taylor's motion to suppress evidence obtained as the result of the November 26 stop, ruling:

> With regard to the stop of the vehicle, while the vehicle in which the defendant was a passenger was already stopped at the time they approached the vehicle, the court considers the encounter to be a Terry stop. The passenger in a car such as Mr. Taylor has standing to challenge that stop due to the seizure of his person inherent in the stop. Under Terry, an officer must be able to testify to specific articulable facts creating a suspicion of criminal activity that reasonably warrants the stop.

JA 224. The court went on to conclude that the stop was justified by reasonable suspicion, finding the officers' testimony credible. JA 225. The court ruled that the following circumstances gave rise to a reasonable suspicion justifying the stop:

- The officers were in the neighborhood in response to a call concerning a burglary;
- When the car passed the officers, the occupants looked down and away from the officers;
- The car parked on its own in front of a duplex where no other cars were located, and the occupants of the car did not leave after one of them knocked on the door and got no answer;
- Despite the cool weather, Taylor had his window open and his hand out of the vehicle.

JA 225. The court thus concluded that "the initial stop was valid and reasonable in duration." JA 226.

## III.  Jury selection

Jury selection began on January 22, 2014. During jury selection, only three African-American jurors were part of the jury venire. JA 325. While the defense struck one of the three, the government struck the remaining two African-American jurors,

leaving the jury "completely all white and looking like it's going to stay that way." JA 325. Taylor raised a *Batson* challenge to the government's strike of juror number 5, Carol Robinson. JA 304, 325, 329. Defense counsel asserted that "[u]nder the circumstances here, and particularly given the limitations in the jury [venire] that started off with a relatively Spartan collection of non-white jurors and then resulted in the final two black jurors being stricken, one with no apparent reason or difference from the other members of the jury aside from her race, I believe that creates an inference requiring the government to assert its reasoning." JA 330. Defense counsel pointed out that the government had used four peremptory strikes, and half of them were against "two of the three African-American jurors who have been in the jury pool. And given the absence of other explanations for at least one of those, we would submit that the totality of the circumstances gives rise to a prima facie case triggering the prosecution's duty to explain its reasoning." JA 332.

The district court required the government to put on the record its reasons for striking juror 5. JA 333. The prosecutor stated that she struck Robinson because she had been a cashier at Wal Mart for the past seven years; was a single mother with three children; had a very meek voice that was hard to hear; seemed to be having hearing issues while defense counsel questioned her and asked him to repeat himself; "look[ed] lost in the courtroom, with a lost look in her eyes"; stated she did not like guns but would not say why; and would not make eye contact with the prosecutor. JA 335-36.

10

In response to the prosecutor's comments about Ms. Robinson, defense counsel pointed out that "there are other people on the jury who didn't get struck for having a meek voice"; that other people likely also had trouble hearing defense counsel because defense counsel doesn't "speak up enough"; not liking guns is "pretty favorable for" the prosecution; and other people on the jury have expressed having issues with guns and haven't been stricken on those grounds. JA 336-37.

The court noted "the things you said about that particular juror the court noted also in terms of her being somewhat distracted, not being as engaged, and seeming much more uncomfortable than the rest of the folks on the panel." JA 338. The court concluded that "having listened to the reasons given by the government, which is a race neutral reason, the court finds that that's—that that reason, having observed this juror, is not outside the realm of credibility and is sufficient to survive the *Batson* challenge." JA 338. The court found that the prosecutor had no discriminatory intent and denied Taylor's *Batson* motion. JA 339-40.

## IV. Trial

### A. The trial evidence

As it did at the suppression hearing, the government presented evidence at trial of the events that unfolded on November 26, 2012, beginning with the encounter between CMPD officers and Taylor and his companions on Anderson Street in Charlotte. JA 422-23. This time, though, Officer Skipper explained that he and Officer Watson were on motorcycle patrol in the area at around 10:50 a.m., riding side

by side, looking for a lone break-in suspect fleeing on foot a half mile away from where they spotted the car Taylor was riding in. JA 422-23, 428-29, 449. The break-in had occurred south of the area, and the car was coming from the north. JA 431-32.

Watson testified that as the officers approached the car, the driver looked down, and the passengers looked away, which "was an attention getter." *Id.* at 70. Taylor was in the front passenger seat. JA 449. Preston Fields was the driver, and Marquise Randolph was in the back seat; Watson did not ask whether either of them was related to Taylor. JA 475

Watson and Skipper disagreed about the car's path of travel—Watson thought it was at a stop sign turning onto Anderson, while Skipper thought the car was following a straight path on Anderson. *Id.* at 44, 70. The officers also disagreed about the speed limit on Anderson. JA 423, 449

Skipper testified that the car speeded up from about 35 miles per hour to about 50 miles per hour after it passed the officers on Anderson. JA 423. The officers lost sight of it as it rounded a corner and then "came in full sight of it . . . a block or two away" as it "quickly pulled into a driveway at 1414 Anderson Street." JA 423; *see also id.* at 450. It parked in the concrete driveway shown in Government Exhibit 3. *Id.* at 454, 700. The officers caught sight of the car again right around the intersection of Byrnes Street, as marked by an arrow on Government Exhibit 2b. *Id.* at 437, 467, 699. Neither officer saw a gun or anything else being thrown from the car. *Id.* at 438, 468.

The officers parked across the street from the vehicle and watched it for about two minutes. JA 424, 451. Skipper noticed that the front passenger window was down five to six inches, and Taylor's right hand was outside the window. JA 424. The temperature was about 40 degrees that day, and the officers were wearing heavy gloves and two coats, but they were exposed to the wind on their motorcycles, which don't have a windshield. JA 424, 428-29. While the officers watched, the driver got out of the car, went to the door of the duplex at 1414 Anderson, waited for about 45 seconds, and then returned to the car.

The officers then pulled into the gravel lot beside the car and approached the men in the car, with Skipper making contact and Watson providing cover. JA 440. When they approached the car, the driver's side window was also down. JA 444. The men were cooperative, allowing Skipper to search them and to search the car. JA 443. Skipper found no contraband, either on the men or in the car. JA 444.

While Watson was providing cover, he heard radio traffic that a gun had been found at a bus stop near two motorcycle officers, but at an address "quite a few blocks away." JA 452, 456. A bus had stopped, "discharged a passenger or two, and left" after Skipper had talked to Taylor. JA 456. A car or two may have passed as well. *Id.* After the bus passengers left, no one was in the area. JA 457. Watson walked over to a nearby bus stop, shown on Government's Exhibit 3, to investigate and found a revolver in the grass three to four feet from the street. JA 452-54, 700. The gun was about 75 feet away from where the car was parked. JA 447. When he saw the gun,

13

Watson called for backup. JA 453. He didn't touch the gun and didn't see anyone else touch it before crime scene technicians arrived. JA 477-79.

According to Watson, once the officers "were done speaking with Mr. Taylor and the other individuals" and "focused [their] attention on collecting the firearm," he looked over "[a]t one point" and Taylor and the other men were watching the officers. JA 458. But other people in the neighborhood also came out of their homes and watched the officers' activities. JA 445. Officers did not arrest Mario Taylor that day, and they did not investigate whether anyone had seen Taylor with a gun that day or had seen a gun thrown from the car. JA 476.

Officer Theodore Castano testified that at Watson's request, he responded to the scene "regarding a gun that was tossed on the ground" and, upon arriving, "stood by it to preserve the evidence." JA 480. He did not touch the gun, and he made sure no one else touched it. JA 481. He called for a CMPD crime scene technician to collect the weapon. JA 481.

Castano contended that he was able to tell the gun was loaded without picking it up from the ground. JA 481. He told the technician "that there was a good chance there's DNA on the gun from a convicted felon and that we need to be very careful how we process this gun because this case is probably going to wind up in federal court." JA 482. Castano noticed that Mario Taylor "was up the street standing next to a Crown Victoria" when he arrived and described Taylor as "loitering," but he also acknowledged that "there were other officers that were standing up the street a little

14

ways from me . . . so I figured they were watching him while I was with the gun." JA 483. Castano testified that Taylor "appeared concerned," that "he was out there the whole time we were out there watching what we were doing. . . . there's a gun laying on the ground, but I didn't see anybody else out there that stuck around that long." JA 483. But he acknowledged that the Crown Victoria remained at the scene, and he was not sure if Preston Fields, the driver, remained at the scene for the duration of the gun collection. JA 484.

Mark Wilson, a CMPD crime scene search investigator, collected the Taurus revolver found in the grass of the church at 1413 Anderson Street that day. JA 490. He photographed the gun as it was found that day. *Id.* Unlike Castano, who said he could tell that the weapon was loaded without picking it up, Wilson had to pick up the gun to see the cartridges in the chamber. JA 500. He used gloves to pick up the weapon, placed it in a new box, and took it back to the crime scene office where additional photographs were taken. JA 492. The revolver was loaded with six cartridges, which he removed from the weapon. JA 495. Once he packaged the evidence, he turned it in to property control. JA 498.

Todd Roberts, a latent fingerprint examiner with the CMPD, testified as an expert in latent fingerprint analysis. JA 522. He did not recover any fingerprints from the gun or bullets submitted in this case. JA 524. He also swabbed the grip of the gun for future DNA analysis. JA 525.

15

Rachael Scott, an employee who works in the crime lab of CMPD, testified as an expert in forensic DNA analysis. JA 536. She received a buccal swab from Mario Taylor as well as a revolver, cartridges, and swabs from the grip of a weapon. JA 543. She was not asked to compare the swabs taken from the weapon's grip to anyone other than Taylor. JA 556.

She conducted DNA analysis from the swabs taken from the weapon's grip on March 22 and concluded that the DNA profile consisted of a mixture of at least three individuals. JA 546-47. Out of that mixture of at least three individuals, she determined "a partial major DNA profile." JA 547. She compared the partial major DNA profile to the DNA profile she developed from the sample taken from Mario Taylor and concluded that "the partial major DNA profile matches the DNA profile obtained from the buccal standard from Mario Taylor." JA 548. She went on to say that "[t]he probabililty of selecting an unrelated person at random who could be the source of this partial major DNA profile is approximately 1 in 74.5 billion" and that only 7.1 billion people inhabit the earth. JA 548.

Scott acknowledged that the DNA detection process she used can detect DNA in amounts as small as one nanogram—which is a thousandth of a thousandth of a thousandth of a gram. JA 549. Because the test detects DNA in such small amounts, analysts have to take special precautions to avoid contaminating samples. JA 553-54. Scott also acknowledged that, while DNA can transfer directly from a person to an object, it also can move by a secondary transfer from one object to another one. JA

558 So, for instance, if counsel touched Taylor's collar and then touched a pen, that contact could transfer Taylor's DNA to the pen even though Taylor never touched the pen. JA 560. The fact that someone left a major profile—meaning more DNA than the other people in the profile—does not give any indication of when a person had contact with an item or if he even had contact with the item at all. JA 563. Scott testified that DNA can remain on an object for years. JA 565.

Gerod King, an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), testified as an expert in the field of firearms identification and place of manufacture. JA 513. He testified that the firearm at issue in this case was manufactured by Taurus in Brazil, was imported into the United States through Miami, Florida, and, in his opinion, traveled in and affected interstate commerce. JA 515-16.

After the government played for the jury a recording of a call made from the arrest processing center of the Mecklenburg County, North Carolina, jail on April 22, 2013, ATF Special Agent Rodney Blacknall testified that he recognized Mario Taylor's voice on the jail call saying "they got my hands, that's all they got." JA 587.

The court denied the defendant's Rule 29 motions for acquittal at the close of the government's evidence, although the court stated "[i]t's pretty close." JA 589, 592, 595

### B.    The constructive possession instruction

During the jury charge conference, defense counsel objected to the court's instructing the jury on constructive possession because "[t]here is literally no evidence of constructive possession here. None. The entire evidence is actual possession taken in the favor of the government. There is zero evidence that he didn't actually touch it but had control over it." JA 603-04; *see also* 606, 609, 621, 22, 629.

The court overruled Taylor's objection and instructed the jury on constructive possession. *Id.* at 300-01.

### C.    The jury's verdict

The jury returned a verdict of guilty, and the district court denied Taylor's motion for acquittal following the verdict. JA 692, 695.

## V.    Sentencing

The district court held a sentencing hearing on December 14, 2014, and Taylor at that time withdrew his only objection to the Presentence Investigation Report (PSR). JA 706. The district court found that Taylor's total offense level was 22, his criminal history category was IV, and his Guidelines sentencing range was 63-78 months' imprisonment. JA 707. Taylor and the government agreed that this calculation was correct. *Id.* Taylor argued for a downward variance to 46 months' imprisonment. JA 708. The government requested a 70-month sentence. JA 729. The district court varied downward by two levels, to a range of 51-62 months, and

sentenced Taylor to 54 months' imprisonment and two years of supervised release. JA 733-34.

Taylor now appeals.

## SUMMARY OF ARGUMENT

Taylor raises three issues, each of which requires reversal of his conviction.

First, the district court erred when it denied Taylor's motion to suppress evidence obtained as the result of law-enforcement officers' seizure of Taylor—a seizure that resulted in the discovery of Taylor's identity and the government's subsequent use of his prior-obtained DNA sample for comparison to the grip of the gun. The district court correctly concluded that officers seized Taylor and his companions when they approached the men's vehicle. But it erred when it concluded that reasonable suspicion justified the stop. Here, the officers articulated no specific facts giving an objective basis for suspecting Taylor or either of his companions of engaging in criminal activity, and the stop was not supported by reasonable suspicion. Thus, the district court's denial of Taylor's motion to suppress was erroneous, and his conviction must be vacated.

Second, the district court clearly erred when it overruled Taylor's *Batson* motion made in response to the government's strike of juror Robinson, the last African-American juror in the venire. The strike of Robinson resulted in an all-white jury. The court clearly erred in failing to find that the government's stated reasons for striking juror Robinson were pretextual and in failing to conduct comparative juror analysis.

19

Finally, the district court abused its discretion when it instructed the jury on constructive possession, when no evidence in the record supported a finding of constructive possession. Rather, all the inferences from the evidence pointed to actual possession, if any possession occurred at all. Here, where the evidence of actual possession was, as acknowledged by the district court, "close," JA 592, providing the government with a less demanding standard to prove possession was prejudicial and requires reversal of Taylor's conviction.

## ARGUMENT

I.  **Law enforcement officers violated Taylor's Fourth Amendment rights when they seized him without reasonable suspicion.**

  A.  **Standard of Review**

In considering a district court's denial of a motion to suppress, this Court reviews legal determinations *de novo* and factual findings for clear error. *United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir. 1997). A district court's determination that reasonable suspicion justified police action is a legal conclusion subject to *de novo* review. *United States v. McCoy*, 513 F.3d 405, 410 (4th Cir. 2008).

  B.  **Police officers seized Taylor when they approached the car in which Taylor was seated as a passenger**.

The district court concluded that the law enforcement officers' encounter with Taylor amounted to a seizure, ruling "while the vehicle in which the defendant was a passenger was already stopped at the time [the officers] approached the vehicle, the court considers the encounter to be a *Terry* stop" requiring the government to

demonstrate "specific articulable facts creating a suspicion of criminal activity that reasonably warrants the stop." JA 224. The district court was correct: Officers Skipper and Watson seized Taylor when they approached the parked car in which he was a passenger and began questioning the driver and passengers.[3]

The Fourth Amendment protects "the people's" right "to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. Amend. IV. It is beyond question that under the Fourth Amendment, "an investigatory detention of a citizen by an officer must be supported by reasonable articulable suspicion that the individual is engaged in criminal activity." *United States v. Black*, 707 F.3d at 537 (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1967)). For Fourth Amendment purposes, a person is seized when, under all of the circumstances, a reasonable person in his position would not have believed that he was free to leave. *Id.* (quoting *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980))).

While a seizure does not occur "simply because a police officer approaches an individual and asks a few questions," when an officer shows authority or uses physical force that would make a reasonable person feel he was not free "'to disregard the police and go about his business,'" a seizure occurs. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). The following

---

[3] The district court also correctly noted that as a passenger, Taylor had standing to challenge the "stop due to the seizure of his person inherent in the stop." JA 224; *see Brendlin v. California*, 551 U.S. 249, 258 (2007) (passengers are seized in traffic stops and thus may challenge the legality of such stops).

21

factors are relevant in determining whether a "show of authority" by law enforcement officers would make a reasonable person feel he was not free to leave: (1) "the number of police officers present"; (2) whether the officers "were in uniform and whether they displayed their weapons"; (3) whether the officers "touched the defendant or made any attempt to physically block his departure or restrain his movement"; (4) whether the officer's tone was "conversational" as opposed to "intimidating"; (5) whether the officers told the defendant that they suspected him of illegal activity; and (6) whether, if the police officer requested identification, "the officer promptly returned it." *United States v. Gray*, 883 F.2d at 322-23.

However, as this Court demonstrated in *United States v. Jones*, the foregoing factors are simply examples of relevant factors. 678 F.3d at 300. A seizure may occur when only some of the factors are present. In *Jones*, for example, only two officers were present, they did not display their weapons, and the officers made "requests" rather than giving "orders." *Id.* at 299, 303. This Court still found that the officers seized Jones based on facts similar to those presented in this case.

First, as in *Jones*, "the encounter here began with a citizen *knowing* that the police officers were conspicuously following him"; Taylor was not "a citizen, previously unaware of the police, being approached by officers seemingly at random." *Id.* at 300. Officers Skipper and Watson followed the car and then parked across the street, in a spot where the men could see them, and watched the men for two minutes before they approached. JA 100. There was no evidence that the officers were not in

uniform, and they carried weapons, although they did not draw them. JA 128. Furthermore, the number of officers present increased during the encounter, with at least two or three officers remaining near Taylor at all times and more officers across the street where the gun was found. JA 108.

Additionally, the officers positioned themselves in a way that prevented Taylor and his companions from leaving. The car was parked on a concrete driveway, and the only way the driver could get out of the driveway was to back out. *See* JA 49;[4] Govt. Ex. 2B (JA 699). While Officer Skipper was talking to the men, Officer Watson was positioned behind the car and was moving from side to side as Skipper moved, always remaining on the opposite side of the car from Skipper and watching the men in the car. So at all times during Skipper's questioning of the men, an armed officer was on each side of the car. JA 104, 115-16, 124, 135. And as in *Jones*, "before the verbal encounter even began, this case lacked a traditional hallmark of a police-citizen consensual encounter: the seemingly routine approach of the police officer." 678 F.3d at 300. Under *Jones*, the fact that this was a targeted encounter, combined with the officers' physical blocking of the car's departure with their bodies, is "particularly significant." *Id.* "[W]hen an officer blocks a defendant's car from leaving the scene, particularly when, as here, the officer has followed the car, the officer demonstrates a greater show of authority than does an officer who just happens on the scene and engages a citizen in conversation." *Id.* at 302.

---

[4] JA 49 is Government Exhibit 2 from the suppression hearing.

Furthermore, the fact that the driver may have—at some point when Officer Watson was not moving back and forth behind the car—been able to back out between the two officers who were positioned on opposite sides of the car does not mean that a reasonable person would have felt free to leave under these circumstances. *See United States v. Kerr*, 817 F.2d 1384, 1387 (9th Cir. 1987) (suggestion that driver could have backed around deputy's car or ignored his approach "defies common sense"). Considering the additional fact that the car and its occupants were obviously the target of a police investigation, no reasonable person in Taylor's position would have felt free to leave.

Finally, the Court in *Jones* pointed out the significance of the officers' failure to ask Jones, at the outset of the encounter, if they could speak with him or to explain that they were conducting a routine patrol. *Id.* at 303. The same thing occurred here. When Skipper approached the car, he immediately began questioning the driver, asking him whether anyone was home; he then asked for the identification of all of the car's occupants, and following that, he asked the driver to step to the back of the vehicle and questioned him about the presence of weapons in the vehicle. JA 102-03, 116-17. While Skipper was careful to characterize the men's responses as "consensual" and "volunteered," his description does not determine how a reasonable person would have interpreted the encounter. JA 102-03, 117. *Jones* explains that "[a] request certainly is not an order, but a request—two back-to-back requests in this case—that conveys the requisite show of authority 'may be enough to make a

reasonable person feel that he would not be free to leave.'" 678 F.3d at 303 (quoting *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004)). As in *Jones*, Skipper's "immediate verbal exchange," beginning with asking the driver whether anyone was at home and continuing with a request for identification of all of the vehicle's occupants "did nothing to lessen a reasonable person's suspicion that he was the target of a criminal investigation and, in light of the totality of the circumstances, only enhanced it." 678 F.3d at 303.

A reasonable person in Taylor's position would not have felt free to leave. "[T]he totality of the circumstances would suggest to a reasonable person in [Taylor's] position that the officers suspected him of some sort of illegal activity . . . which, in turn, would convey that he was a target of a criminal investigation and thus not free to leave or terminate the encounter." *Id.* at 304. Police officers seized him when they approached the car, blocked its exit, and conducted an investigation obviously targeted at Taylor and his companions.

## C.   The officers had no reasonable suspicion when they stopped Taylor.

Although the district court correctly concluded that officers seized Taylor, it erred when it went on to rule that the seizure was justified by reasonable suspicion. JA 225-26. "To be lawful, a *Terry* stop 'must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in a criminal activity.'" *Black*, 707 F.3d at 539 (quoting *Reid v. Georgia*, 448 U.S. 438, 440 (1980)). To show a

reasonable and articulable suspicion, the officer must be able to articulate specific facts which lead to an objective basis for suspecting the person stopped of engaging in criminal activity. *Id.* And "the specific facts must be specific and particular to the individual seized." *Id.* at 540. An "inchoate and unparticularized suspicion or hunch" does not satisfy the reasonable suspicion requirement. *United States v. Foster*, 634 F.3d at 246.

Here, the district court found that four facts gave rise to a reasonable suspicion, although it never articulated *what offense* the officers could have suspected Taylor of committing. JA 225-26. First, the court found that reasonable suspicion was supported by the fact that officers were in the neighborhood in response to a call concerning a burglary. JA 225. While this is true, the officers provided no testimony regarding a description of the suspect they were looking for or the source of their information.[5] In other words, the government presented no evidence that the officers were relying on anything more than an anonymous tip. To support reasonable suspicion, an anonymous tip must be corroborated and must exhibit sufficient indicia of reliability. *Florida v. J.L.*, 529 U.S. 266, 270 (2000). Here, there was no evidence that the tip about a burglary was corroborated: there was no evidence that the tip included any predictive information, such as a description of the suspect or suspects or their direction of travel, leaving "the police without means to test the informant's

---

[5] Trial testimony revealed that they were looking for a suspect on foot and that the vehicle Taylor was riding in was not coming from the direction of the burglary. JA 429, 431.

knowledge or credibility." *Id.* at 271. For example, in *United States v. Massenburg*, this Court concluded that police had no reasonable suspicion where police had received an anonymous report that eight shots "were 'possibly' fired two blocks south of a certain intersection" with "no physical description of the perpetrators or any other outward identifying features." 654 F.3d 480, 487 (4th Cir. 2011). "The only link between the tip and Massenburg's group was the group's rough proximity to the alleged site of the gunfire." *Id.* This case is the same. Without any description of a suspect, the officers could not reasonably suspect that the occupants of the Crown Victoria committed the burglary simply because they were near the neighborhood where it occurred. Mere "rough proximity" is insufficient to establish reasonable suspicion. *Id.*

Second, the court found that reasonable suspicion was supported by the fact that, when the car passed the officers, the occupants looked down and away from the officers. JA 225. But, as this Court pointed out in *Massenburg*, the government often argues that the opposite behavior—looking at or staring at officers—is suspicious. 654 F.3d at 489 (citing *United States v. Foreman*, 369 F.3d 776, 787 n.1 (4th Cir. 2004) (Gregory, J., concurring in part and dissenting in part) (collecting cases)). "Given the complex reality of citizen-police relationships in many cities, a young man's keeping his eyes down during a police encounter seems just as likely to be a show of respect and an attempt to avoid confrontation." *Id.* And while engaging in evasive behavior or acting nervously is relevant to reasonable suspicion, *id.* at 490, Taylor and his companions engaged in no evasive behavior: it is undisputed that they parked their car

right next to the street soon after passing the officers, and they made no attempt to leave while the officers watched them for two minutes before approaching them. Furthermore, neither officer testified that Taylor or either of his companions appeared nervous.

To establish reasonable suspicion, the government "must . . . be able to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *United States v. Foster*, 634 F.3d at 248. Here, "there was nothing exceptional" about the actions of Taylor and his companions in looking away from the officers when they encountered them, and the officers offered no explanation for why that behavior was unusual or suspicious. *Id.*; *see also United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) (no reasonable suspicion even though officer knew Sprinkle had a criminal record and Sprinkle raised his hand to the side of his face as if to conceal identity). The fact that Taylor and his companions did not make eye contact with the officers when they passed does not support any reasonable suspicion.

Third, the court found that reasonable suspicion was supported by the fact that the the car parked on its own in front of a duplex where no other cars were located, and the occupants of the car did not leave after one of them knocked on the door and got no answer. JA 225. This hardly gives rise to a reasonable suspicion of any offense, including a burglary. First of all, the duplex the car parked in front of was directly

28

across the street from a bus stop. JA 127, Govt. Ex. 3 (JA 700). Many city residents—particularly low-income residents—do not own cars and use city buses for transportation. The fact that no cars were in the driveway hardly means that the driver pulled into the driveway expecting no one to be home. And furthermore, the fact that the driver didn't pull out of the driveway immediately after no one answered the door provides no additional support for a reasonable suspicion that the men in the car intended to break into the apartment or to do anything else illegal. Officers Skipper and Watson gave the men no time to leave: within 45 seconds, the officers had approached the car. JA 100.

Finally, the court relied on the fact that, despite the cool weather, Taylor had his window open and his hand out of the vehicle. JA 127. But the officers offered no explanation for why this fact was suspicious at the time they seized Taylor and identified him. While the government used that fact at trial to suggest that Taylor had thrown the gun from the car, JA 637, the gun was found across the street *after* the officers seized Taylor. Consequently, any connection to the gun cannot justify the seizure. *Black*, 707 F.3d at 539 n.5. And neither the government nor the district court offered any explanation of how having an open car window could raise a suspicion that Taylor was involved in a burglary.

Rather than providing reasonable suspicion, the factors identified by the district court merely "patch[ ] together a set of innocent, suspicion-free facts, which cannot rationally be relied on to establish reasonable suspicion." *Id.* at 539. The officers

29

lacked reasonable suspicion to stop Taylor, and the district court erred in denying Taylor's suppression motion. This Court should reverse the district court's ruling and vacate Taylor's conviction and sentence.

## II. The district court clearly erred when it denied Taylor's *Batson* objection to the prosecution's strike of Juror Robinson.

### A. Standard of Review

This Court reviews for clear error a district court's findings regarding discriminatory intent in the selection of jurors. *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995). Under clear error review, this Court gives "great deference" to the district court's ruling, *United States v. Barnette*, 644 F.3d 192, 214 (4th Cir. 2011), but even under this highly deferential standard, when a district court fails to engage in a proper analysis, or when the proffered rationales are pretextual, reversal is appropriate. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).

### B. The Equal Protection Clause prohibits striking jurors based on race.

Under the Supreme Court's well-established precedent, the Equal Protection Clause prohibits any party from "exercis[ing] a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race." *United States v. Martinez-Salazar*, 528 U.S. 304, 315 (2000). The striking of even a single prospective juror for discriminatory reasons violates the Constitution and requires reversal. *Snyder*, 552 U.S. at 478; *United States v. Lane*, 866 F.2d 103, 105 (4th Cir. 1989).

In *Batson v. Kentucky*, the Supreme Court developed a three-step framework for evaluating claims of impermissible discrimination in the jury selection process. 476 U.S. at 93-98. First, a defendant must establish a *prima facie* case that the prosecution exercised peremptory strikes in a discriminatory manner. *Id.* at 96-97. A defendant has standing to raise a claim of discrimination in jury selection even if his race, ethnicity, or gender is not the same as the excluded juror's. *Powers v. Ohio*, 499 U.S. 400, 415 (1991). In establishing a *prima facie* case, "the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)). Although the mere striking of potential jurors who are members of protected class is not enough, alone, to establish a *prima facie* case, *United States v. Farrior*, 535 F.3d 210, 221 (4th Cir. 2008), it is clear that the defense does not have to establish a pattern of discriminatory striking, because striking even one potential juror based on impermissible discrimination is sufficient to establish a *Batson* violation. *Snyder*, 552 U.S. at 478.

Second, once the defense makes a *prima facie* case, "the burden shifts to the [government] to come forward with a neutral explanation" for the strike in question. *Batson*, 476 U.S. at 97. If the government provides an explanation for its peremptory strikes, whether at the district court's prompting or not, this Court will not consider whether the defendant has made a *prima facie* showing but instead will go on to

"review only the district court's finding of discrimination *vel non*." *United States v. Forbes*, 816 F.2d 1006, 1010 (4th Cir. 1987); *see also United States v. Dinkins*, 691 F.3d 358, 380 n.17 (4th Cir. 2012) (same).

Third, after the prosecution has offered a non-discriminatory reason for the strike, the district court has a "duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98. In other words, "the defendant[ ] must show that the government's proffered race-neutral reasons were 'merely pretextual,' and that the government exercised the particular peremptory challenge on the basis of race." *Dinkins*, 691 F.3d at 380 (citing *United States v. McMillon*, 14 F.3d 948, 953 (4th Cir. 1994)).

Determining whether the government's strikes are pretextual requires the district court to consider "all the evidence" that might bear on the reason for the strike. *Barnette*, 644 F.3d at 204. At this third step, a "side-by-side comparison[ ]" of jurors who were peremptorily struck with those who were not can be highly probative of purposeful discrimination: "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Barnette*, 644 F.3d at 205 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)). This Court has held that, in a case that it had previously remanded for reconsideration of a *Batson* issue, the district court "was *required* to . . . engage in a

carefully calibrated comparative juror analysis" after *Miller-El. Barnette*, 644 F.3d at 205 (emphasis added).

In *Snyder v. Louisiana*, the Supreme Court recently reaffirmed the importance of performing a comparative juror analysis after counsel raises a *Batson* objection. 552 U.S. at 483. In *Snyder*, the trial court denied the defendant's *Batson* objection to the prosecutor's strike of Jeffrey Brooks, a black college student. *Id.* at 478. The prosecutor provided two reasons for the peremptory strike: that Brooks "looked very nervous" and that he expressed concern about the time commitment involved in serving on the jury. *Id.* The Court concluded that neither of the prosecutor's reasons passed muster. First, with regard to Brooks's demeanor, the district court made no findings of fact about whether Brooks appeared nervous. *Id.* at 479. Accordingly, the Supreme Court rejected that rationale. *Id.* With regard to Brooks' concern about the time involved in serving on the jury, the Court noted that other members of the venire "expressed concern that jury service or sequestration would interfere with work, school, family, or other obligations" and that Brooks's concerns had been alleviated after the district court contacted the dean of his school. *Id.* at 480-81. The Court then compared Brooks to a white potential juror whose "obligations seem[ed] substantially more pressing." *Id.* at 483-84. The prosecutor also had accepted another white juror who twice expressed his concern about work responsibilities. *Id.* at 484. The Court concluded that the comparison to white jurors reinforced the

33

"implausibility" of the prosecutor's explanation and established that it was pretextual, which "naturally gives rise to an inference of discriminatory intent." *Id.* at 485-86.

## C. The district court clearly erred when it failed to engage in necessary comparative juror analysis and when it concluded that the government's proffered reasons were not pretextual.

With respect to step one, the district court implicitly found that the defense made a *prima facie* showing when it said, "any time you have a venire that . . . there's a very small number of African-American jurors . . . and the government strikes the last two . . . so that now we have an entirely white jury, I do think . . . that you need to explain what your reasons for each of the strikes was." JA 333. The court then required the government to put on the record its reasons for striking the last two African-American jurors. *Id.* Taylor only challenges the strike of juror Robinson on *Batson* grounds.

Because the district court required the government to explain its reasons for striking Juror Robinson, the only relevant inquiry on appeal is whether the district court's ultimate finding of non-discriminatory intent at step three was clearly erroneous. *Forbes*, 816 F.2d at 1010. The prosecutor explained that she struck Robinson because she had been a cashier at Walmart for seven years; was a single mother with three children; had a meek voice and was hard to hear; seemed to have hearing issues during defense counsel's questioning and asked him to repeat himself; looked lost in the courtroom; indicated that she does not like guns; would not explain

why she doesn't like guns; and would not make eye contact with the prosecutor. JA 335-36.

In response, defense counsel pointed out, "I think there are other people on the jury who didn't get struck for having a meek voice." JA 336. Defense counsel also noted that he is soft-spoken, and "I'm pretty sure there are other members of the jury who had that problem too." JA 336. Defense counsel also pointed out that in this case, a juror who doesn't like guns is "pretty favorable for" the prosecution and that the government did not strike other jurors who expressed issues about guns. JA 336-37.

In fact, the government did not strike white jurors who, unlike Robinson, had guns and *didn't* dislike them—jurors who, presumably, would be *less* favorable toward the government's prosecution of a gun charge than Robinson. For instance, juror Coppinger raised his hand in response to the question "are there any gun owners on the jury right now?" and said he owned one gun. JA 284. He answered "no" to the question "do you possess any strong opinions about the possession of firearms generally?" *Id.* Juror Dunegan also raised his hand in response to the gun-owner question and said that he owned six guns. JA 285. He answered "no" to the question "[a]ny strong opinions about gun laws or gun possession?" *Id.* Juror Donnelly also raised his hand in response to the gun-owner question and volunteered, "[n]o strong opinions one way or the other." *Id.* Jurors Cherrier and Barkley also raised their hands in response to a gun-ownership question. JA 321. Cherrier said that she did not own a

gun but "believe[d] in responsible ownership" and that she felt "like it's a privilege to own a gun." JA 321. Barkley said he had handled guns but didn't own one or have strong feelings about guns. *Id.* The government did not strike any of these jurors.

The government also questioned juror Robinson differently than it questioned other jurors. For starters, she is the only juror whom the government picked out for questioning about guns who had not raised her hand in response to the gun ownership question. JA 322. And instead of asking her whether she had "*strong* opinions about gun laws or gun possession," the government asked a much broader question: "[a]ny feelings about guns one way or another?" And unlike its response to juror Cherrier, who also voiced an opinion about guns, the government never asked Robinson whether her feeling about guns would give her trouble in following the law as instructed by the judge. *Compare* JA 321 *to* JA 322.

The court denied Taylor's *Batson* motion, stating that it "noted also in terms of her being somewhat distracted, not being as engaged, and seeming much more uncomfortable than the rest of the folks on the panel," that the government's reasons were "race neutral," and that the reasons were sufficient to survive the *Batson* challenge. JA 338. A juror's inattentiveness or disinterest may suffice as a valid, neutral reason for a peremptory challenge. *United States v. Garrison*, 849 F.2d 103, 106 (4th Cir. 1988). However, the fact that the prosecution presented a potentially non-discriminatory rationale does not end the inquiry.

36

At the third step, the district court must determine "in light of *all the evidence* with a bearing on it, whether the defendant has proven intentional discrimination." *Barnette*, 644 F.3d at 204 (emphasis added) (internal quotations omitted). Here, the government gave a reason—Robinson's statement that she didn't like guns—that does not ring true because, as defense counsel pointed out, in a gun-possession case, a juror who doesn't like guns would be favorable to the prosecution. The government's statement that Robinson seemed to have trouble hearing also appears pretextual, because defense counsel pointed out that he is soft-spoken, and Robinson had no trouble hearing the prosecutor when the prosecutor questioned her. Furthermore, the fact that the government picked Robinson out for broad questioning about guns and didn't treat any other juror this way explains why Robinson would have seemed more uncomfortable than other jurors and demonstrates that the government was seeking a reason to strike Robinson and that its reasons were pretextual. The government's racially disparate questioning of potential jurors demonstrates pretext, *Miller-El*, 545 U.S. at 249, 255, and the district court clearly erred when it denied Taylor's *Batson* motion.

But furthermore, defense counsel sought to have the district court engage in comparative juror analysis when it pointed out that the government did not strike white jurors who had similar characteristics to Robinson, such as a meek voice, trouble hearing defense counsel, and issues about guns. The district court, though, failed to engage in that analysis. That failure leaves the record bare and makes it

impossible, at this stage of the proceedings, to determine whether Robinson was treated differently than white jurors whom the government did not strike for those reasons. *Cf. Barnette*, 644 F.3d at 201-02 (noting the comprehensive comparative juror analysis that the district court performed before denying the *Batson* objection.) Because the district court did not "adhere[ ] to [its] obligation[ ] to scrutinize the use of peremptory strikes in the faithful performance of [its] duty to combat invidious discrimination in jury selection," *id.* at 208, it clearly erred, and this Court should vacate Taylor's conviction as a result.

## III. The district court committed reversible error when it instructed the jury on the theory of constructive possession when no evidence supported that theory.

### A. Standard of Review

This Court reviews a district court's "decision to give or not to give a jury instruction . . . for abuse of discretion." *United States v. Moye*, 454 F.3d 390, 397-98 (4th Cir. 2006). "An error of law constitutes an abuse of discretion." *United States v. Jeffers*, 570 F.3d 557 (4th Cir. 2009) (citing *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009)). Generally, an error in jury instructions "will warrant reversal of the conviction only if the 'the error is prejudicial based on a review of the record as a whole.'" *United States v. Higgs*, 353 F.3d 281, 309 (4th Cir. 2003).

**B.    The district court should not have instructed the jury on constructive possession, because no evidence supported a theory that Taylor constructively possessed the firearm.**

An instruction is proper "only 'if there is a foundation in evidence to support'" it. *United States v. Whittington*, 26 F.3d 456, 463 (4th Cir. 1994) (quoting *United States v. Schnabel*, 939 F.2d 197, 203-04 (4th Cir. 1991)). While direct evidence is not required, the record must contain "evidence from which the jury could infer" constructive possession. *Id.*

Over Taylor's objection, the district court instructed the jury that it could find Taylor guilty based on a theory of constructive possession, giving the following instruction:

> The law recognizes two types of possession: Actual possession and constructive possession.
>
> A person who knowingly has direct and physical control over a thing at a given time is then in actual possession of it.
>
> Constructive possession exists when a defendant exercises—excuse me. Constructive possession exists when the defendant exercises or has the power to exercise dominion and control over the item.
>
> To find the defendant guilty, the government must prove beyond a reasonable doubt that the defendant knowingly possessed a firearm. The government need only prove that the defendant knowingly possessed an object actually or constructively and he knew that it was in fact a firearm. Proof that the defendant constructively possessed the firearm is sufficient proof of the possession element to support a conviction.
>
> The law recognizes possession may be sole or joint. If one person has actual possession or constructive possession of the thing, then possession is sole. If two or more persons share actual or constructive possession, then the possession is joint.

39

> You may find the element of possession as that term is used in these instructions is present if you find beyond a reasonable doubt that the defendant had actual or constructive possession either alone or joint with others.

*Id.* at 300-01.

As the instruction reflects, "'to establish constructive possession, the government must produce evidence showing ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed." *United States v. Blue*, 957 F.2d 106, 107 (4th Cir. 1992) (quoting *United States v. Ferg*, 504 F.2d 914, 916-17 (5th Cir. 1974)). "The government may prove constructive possession 'by demonstrating that the defendant exercised, or had the power to exercise, dominion and control over the item.'" *United States v. Gallimore*, 247 F.3d 134, 137 (4th Cir. 2001) (quoting *United States v. Jackson*, 124 F.3d 607, 610 (4th Cir. 1997)).

For example, in *United States v. Shorter*, the Court held that the evidence was sufficient for a reasonable fact finder to conclude that Shorter had constructive possession of marijuana and firearms, because they were found in his home in a location where Shorter likely was aware of their presence. 328 F.3d 167, 172 (4th Cir. 2003). Similarly, in *Gallimore*, firearms were found "in a safe that also contained a briefcase holding Gallimore's personal papers," suggesting that he had access to the safe. 247 F.3d at 137.

But here, aside from the evidence permitting an inference of actual possession, no evidence suggested that Taylor, without having actual possession of the firearm, had the power to exercise dominion or control over it. There was no evidence that Taylor owned the gun. It was found in an open field, not on or in any property under Taylor's ownership or control. And it wasn't found near any other objects that suggested that Taylor had access to it.

This case is more like *United States v. Blue*, where this Court held the evidence was insufficient to establish constructive possession. In *Blue*, unlike here, the firearm was found under the passenger seat where Blue was riding in someone else's car. 957 F.2d at 108. Nevertheless, the evidence of constructive possession was insufficient because the car did not belong to Blue, and there was no evidence that Blue owned the gun or had been seen with it before. *Id.* Similarly, there was no evidence here that Taylor owned the gun or had been seen with it before. As in *Blue*, there was no evidence of constructive possession, and the court therefore erred as a matter of law and abused its discretion by instructing the jury on constructive possession.

## C.     The court's error in giving a constructive possession instruction prejudiced Taylor.

Based on a review of the record as a whole, the court's instruction on constructive possession was not harmless, because it told the jury it could find Taylor possessed the firearm without touching it—a standard easier to satisfy than showing actual possession—when the government presented no evidence that Taylor ever had

dominion or control over the firearm without touching it. And the fact that the government presented evidence of *actual* possession does not render the error harmless, because that evidence was circumstantial and, as the district court acknowledged, not overwhelming. When the court denied Taylor's Rule 29 motion for acquittal, it stated, "[i]t's pretty close." JA 592. The evidence was merely: (1) the gun was found near Taylor and two other people; (2) Taylor's DNA was included in a mixture of DNA found on the gun, although the DNA expert acknowledged that she couldn't say how the DNA was transferred to the gun and that it could have arrived there indirectly; and (3) Taylor made a statement, after the DNA tests resulted in his arrest, "they got my hands." *Id.* at 213. No one saw Taylor with the gun, and no one saw Taylor or anyone else throw the gun from the car. With the evidence on actual possession so close, giving the jury an alternative—and easier—way to find that Taylor possessed the firearm made a conviction more likely and prejudiced Taylor.

## CONCLUSION

For the foregoing reasons, this Court should vacate Mario Taylor's conviction.

## REQUEST FOR ORAL ARGUMENT

Taylor respectfully requests oral argument.

DATED this 14th day of May, 2015.

Respectfully submitted,

Ross Hall Richardson
Executive Director
Federal Defenders of
Western North Carolina, Inc.

/s/Ann L. Hester
Ann L. Hester
Assistant Federal Defender
129 W. Trade St., Suite 300
Charlotte, NC 28202
(704) 374-0720

ATTORNEYS FOR APPELLANT MARIO MARQUISE TAYLOR

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*11,163*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[  ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Garamond*]; *or*

[  ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>May 14, 2015</u>          <u>/s/ Ann L. Hester</u>
                                            *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 14th day of May, 2015, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Amy E. Ray
OFFICE OF THE U.S. ATTORNEY
100 Otis Street, Room 233
Asheville, North Carolina  28801
(828) 271-4661

*Counsel for Appellee*

I further certify that on this 14th day of May, 2015, I caused the required copies of the Brief of Appellant and Joint Appendix to be hand filed with the Clerk of the Court.

/s/ Ann L. Hester
*Counsel for Appellant*